## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| **J.P. MORGAN SECURITIES LLC,** ) | |
| ) | |
| **Plaintiff,** ) | **CIVIL ACTION NO.** |
| ) | |
| **v.** ) | |
| ) | |
| **SUSAN M. VANSPYBROOK,** ) | |
| ) | |
| **Defendant.** ) | |

## COMPLAINT
## (INJUNCTIVE RELIEF SOUGHT)

Plaintiff J.P. Morgan Securities LLC ("JPMorgan" or "Plaintiff") files this Complaint and Application for Temporary Restraining Order and Injunctive Relief against defendant Susan M. VanSpybrook ("VanSpybrook" or "Defendant"):

### Preliminary Statement

1.     This action is for a temporary restraining order and a preliminary injunction to maintain the status quo pending resolution of an arbitration proceeding between JPMorgan and Defendant that concurrently is being filed with FINRA Dispute Resolution.[1]

---

[1]     The Financial Industry Regulatory Authority ("FINRA") was created in July 2007 through the consolidation of the National Association of Securities Dealers, Inc. and the member regulation, enforcement and arbitration functions of the New York Stock Exchange.   JPMorgan has the express right to seek temporary injunctive relief before a court of competent jurisdiction pending the outcome of arbitration before a full panel of duly-appointed arbitrators pursuant to Rule 13804 of the FINRA Code of Arbitration Procedure for Industry Disputes.   A copy of Rule 13804 is annexed to the accompanying Declaration of Leonard Weintraub.

2.     This dispute arises out of VanSpybrook's departure from JPMorgan on October 17, 2024, and her subsequent affiliation with Morgan Stanley Smith Barney LLC ("Morgan Stanley"), a direct competitor of JPMorgan.  At the time of her departure, VanSpybrook worked as a Private Client Advisor in a bank branch office of JPMorgan Chase Bank, N.A. ("JPMorgan Chase"), an affiliate of JPMorgan, in Northville, Michigan.

3.     JPMorgan has learned that since leaving JPMorgan and joining Morgan Stanley, VanSpybrook has solicited at least a dozen JPMorgan clients to move their accounts from JPMorgan to her at her new firm.  JPMorgan has learned that shortly after she resigned, VanSpybrook has contacted JPMorgan clients, including calling clients on their personal cell phones, seeking to induce such clients to transfer their accounts from JPMorgan to her at Morgan Stanley.  The clients have informed JPMorgan that VanSpybrook's communications have been more than simply announcing her change of employment, and that she is actively requesting meetings with the clients or otherwise seeking to induce them to do business with her at her new firm.

4.     One client informed JPMorgan that he received a call on his cell phone from VanSpybrook in which she told him that Morgan Stanley can do everything JPMorgan can do and more, which would be better for him.

5.     Another client informed JPMorgan that VanSpybrook called her and told the client that she (VanSpybrook) could continue to help her going forward at Morgan Stanley.

6.     Another client informed JPMorgan that he received a call from VanSpybrook who invited him to her office to discuss moving his portfolio to Morgan Stanley, indicating that Morgan Stanley may have better portfolios than JPMorgan.

7.     Another client informed JPMorgan that she received a call from VanSpybrook who told her (the client) in sum and substance that "you can come with me."

8.     Another client informed JPMorgan that he received multiple calls from VanSpybrook on his cell phone during which she tried to convince him to move his accounts to her at Morgan Stanley, informing him that they can continue to work together at Morgan Stanley.

9.     Another client informed JPMorgan that she received a call from VanSpybrook during which she told the client that if her new JPMorgan Private Client Advisor did not provide the level of service she needed, she should feel free to call her (VanSpybrook) and she would be able to assist the client.

10.    In addition, on information and belief, VanSpybrook took with her to Morgan Stanley JPMorgan's confidential client information, including client

contact information, such as cell phone numbers, which, on information and belief, are generally not publicly available, without which she would have been unable to call and solicit JPMorgan clients so quickly after she left JPMorgan.

11.     Unfortunately, it appears that VanSpybrook's improper solicitation efforts have proved successful, as approximately six JPMorgan households, with assets totaling approximately $11.9 million, already have transferred their accounts to VanSpybrook at her new firm.

12.     At the time she left JPMorgan, VanSpybrook serviced approximately 277 JPMorgan households with approximately $185 million in total assets under supervision, virtually all of which were either pre-existing JPMorgan clients at the time they were assigned to VanSpybrook, or were developed by her at JPMorgan with JPMorgan's assistance.  VanSpybrook now seeks to improperly induce such JPMorgan clients to follow her to Morgan Stanley.

13.     Defendant's conduct constitutes a breach of her employment agreements (which contain non-solicitation and confidentiality provisions), and a violation of her common-law obligations to JPMorgan.

14.     To prevent continued irreparable harm arising from Defendant's course of misconduct, JPMorgan seeks immediate injunctive relief (in the form of a temporary restraining order and a preliminary injunction) barring Defendant from soliciting JPMorgan's clients, and barring Defendant from further using and

4

compelling the return of JPMorgan's confidential and proprietary business and client information, pending resolution of JPMorgan's claims against Defendant in a related arbitration that JPMorgan also is in the process of commencing.

## Jurisdiction and Venue

15.     The Court has jurisdiction in this action pursuant to 28 U.S.C. § 1332(a) in that, as alleged below, plaintiff JPMorgan, on the one hand, and Defendant, on the other hand, are citizens of different states, and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

16.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(a), in that a substantial part of the events giving rise to the claims occurred in Northville, Michigan.

## The Parties

17.     JPMorgan is a Delaware limited liability company and a national broker-dealer, with its principal place of business in New York City, New York. The sole member of JPMorgan is J.P. Morgan Broker-Dealer Holdings Inc., which is a Delaware corporation with its principal place of business in New York, New York.  JPMorgan is a member firm of FINRA.  Defendant maintains securities licenses through FINRA.

18.     JPMorgan provides traditional banking, investment, and trust and estates services in Michigan through its Chase Wealth Management branch offices.

Unlike traditional brokerage firms (where clients are serviced almost exclusively by one financial advisor), JPMorgan's Chase Wealth Management adopts a team approach to service a wide variety of JPMorgan clients' investment and banking needs.

19.     Defendant is an individual who at all times relevant herein prior to her resignation was employed and/or conducted business in Northville, Michigan and is and was a citizen of Michigan.  Defendant also is a registered representative now affiliated with Morgan Stanley in its Farmington Hills, Michigan office.

20.     In connection with her status as a registered representative of JPMorgan, Defendant executed a Form U-4 Uniform Applications for Securities Industry Registration or Transfer.  By executing the Form U-4, Defendant agreed to submit to arbitration disputes, claims and controversies arising between herself and JPMorgan.

## Factual Allegations

21.     VanSpybrook had been employed by JPMorgan or its affiliates since March 2007.  VanSpybrook commenced employment as a Financial Advisor with Chase Investment Services Corp. ("Chase Investment"), then a registered broker-dealer, which was a subsidiary of JPMorgan Chase and an affiliate of JPMorgan, in Westland, Michigan.

22.   In March 2007, in connection with the commencement of her employment, VanSpybrook (nee Anderson) entered into a Chase Investment Services Corp. Supervision, Arbitration, Confidentiality and Non-Solicitation Agreement (the "2007 Non-Solicitation Agreement"), which contains provisions prohibiting her from soliciting the firm's clients for a one year period after the end of her employment and requiring her to maintain the confidentiality of the firm's confidential and proprietary business and client information.  Effective October 1, 2012, Chase Investment merged with and into JPMorgan, with JPMorgan being the surviving legal entity.

23.   In February 2014, VanSpybrook was promoted to a Private Client Advisor for Chase Wealth Management.  In connection with becoming a Private Client Advisor, VanSpybrook entered into a Chase Wealth Management Supervision, Arbitration, Confidentiality and Non-Solicitation Agreement, dated January 7, 2014 (the "2014 Non-Solicitation Agreement"), which contains provisions prohibiting her from soliciting the firm's clients for a one year period after the end of her employment and requiring her to maintain the confidentiality of the firm's confidential and proprietary business and client information.

24.   As a Financial Advisor and Private Client Advisor, JPMorgan Chase referred its bank clients to VanSpybrook in order for her to build JPMorgan's relationship with such clients.  VanSpybrook sat at her desk at a JPMorgan Chase

bank branch – the same bank branch in Northville since 2012 – and was introduced to hundreds of existing bank clients (with or without investment accounts) to offer and provide access to investment opportunities through Chase Wealth Management.  As a Financial Advisor and a Private Client Advisor, VanSpybrook was not expected to engage in cold calling or attempt to build a client base independent of referrals from JPMorgan.

25.     Although VanSpybrook had some prior industry experience before joining JPMorgan, on information and belief, she brought few, if any, clients with her to JPMorgan.   In fact, VanSpybrook was permitted to identify all client relationships that she had established prior to commencing employment with JPMorgan, and those pre-existing relationships would be carved out from the non-solicitation restriction in her 2014 Non-Solicitation Agreement.  The "Attachment A" to the 2014 Non-Solicitation Agreement – the space specifically designated for listing any pre-existing relationships – is blank (meaning VanSpybrook identified no pre-existing client relationships).

26.     As part of her official duties at JPMorgan, Defendant had access to extensive confidential financial records and information about JPMorgan's clients, including information about each client's investment and trust and estates needs. As explained in further detail below, such information – which is not publicly

available, and cannot be easily duplicated – is proprietary and valuable, and would be especially useful to a competitor.

### **Defendant's Employment Agreement and Obligations to JPMorgan**

27.     As noted above, VanSpybrook entered into two substantially similar agreements with JPMorgan that contain provisions prohibiting her from soliciting JPMorgan clients for a period of one year after her JPMorgan employment ends and from using or retaining JPMorgan confidential information.

28.     Section 7(a) of the 2014 Non-Solicitation Agreement, entitled "Confidential Information," provides, in relevant part, that:

> *You understand that, by entering into this Agreement, by virtue of your position with JPMC and by the nature of JPMC's business, you have had access to, currently have access to, will have access to and will consistently and routinely be given trade secrets and confidential information related to JPMC's business. Confidential information concerning JPMC's business includes information about JPMC, as well as described further in the Code of Conduct and subparagraphs (b) and (c) below (the "Confidential Information"). You also understand that you will be provided with specialized training and mentoring that is unique and proprietary, which draws upon, relies upon and is part of the Confidential Information described herein.*

29.     Section 7(b) of the 2014 Non-Solicitation Agreement provides, in relevant part, that, in addition to any description in the Code of Conduct, Confidential Information includes, but is not limited to:

> *i.    names, addresses and telephone numbers of customers and prospective customers;*

*ii. account information, financial standing, investment holdings and other personal financial data compiled by and/or provided to or by JPMC;*

*iii. specific customer financial needs and requirements with respect to investments, financial position and standing; leads, referrals and references to customers and/or prospects, financial portfolio, financial account information, investment preferences and similar information, whether developed, provided, compiled, used or acquired by JPMC and/or yourself in connection with your employment at JPMC;*

\*      \*      \*

*vi. all records and documents concerning the business and affairs of JPMC (including copies and originals and any graphic formats or electronic media);*

\*      \*      \*

*viii. information concerning established business relationships;*

*ix. "trade secrets" as that term is defined by the Uniform Trade Secrets Act (UTSA), which term shall be deemed to include each item of Confidential Information specifically described in this Section.*

30.     In Section 7(c) of the 2014 Non-Solicitation Agreement, Defendant again expressly acknowledges that JPMorgan's customer account information contains confidential financial information, names, addresses, customers' net worth, investment objectives and similar information which is confidential, not readily known by competitors, and must be safeguarded.

31.     In Sections 7(d) and 7(e) of the 2014 Non-Solicitation Agreement, Defendant agreed to maintain the confidentiality of JPMorgan's Confidential Information, not to disclose such Confidential Information to or use for the benefit

10

of any third party, and to return all JPMorgan Confidential Information upon the termination of her employment.

32.    In Section 8 of the 2014 Non-Solicitation Agreement, Defendant agreed not to solicit JPMorgan's clients for a period of twelve months after the termination of her employment:

a.  *You understand and acknowledge that JPMC considers its client and customer relationships important and valuable assets. Accordingly, in consideration of and as a condition of your employment, continued employment, access to trade secrets and Confidential Information, specialized training and mentoring, and other consideration provided herein,* **you understand and agree for a period of twelve (12) months after your employment with JPMC terminates for any reason that you may not on your own behalf or that of any other persons or entities, directly or indirectly solicit or attempt to solicit, induce to leave or divert or attempt to induce to leave, initiate contact with or divert from doing business with JPMC, any then current customers, clients, or other persons or entities that were serviced by you or whose names became known to you by virtue of your employment with JPMC, or otherwise interfere with the relationship between JPMC and such customers, clients, or other persons or entities.**

b.  *You understand and agree that JPMC has developed and uses a unique business model for the sale of investment products. Specifically, you acknowledge and understand that the vast majority of customers with whom you will be working with at JPMC have pre-existing investment relationships with CISC and/or pre-existing and separate banking relationships with JPMorgan Chase Bank, N.A.  Additionally, you will be working with other JPMC employees to develop and strengthen these relationships on behalf of JPMC.  The customer relationships developed at JPMC and given to you by JPMC flow directly from the goodwill, reputation, name recognition, Confidential*

> *Information, specialized training, mentoring and expenditures made by JPMC.*
>
> c. *This section does not apply to customer relationships you established prior to commencing employment with JPMC, provided that you are able to substantiate through documents or other suitable evidence that the relationship preceded commencement of your employment with the JPMC, and any such customers are listed on Attachment A signed by your manager.* (Emphasis added.)

33.    In Section 10(a) of the 2014 Non-Solicitation Agreement, Defendant agreed that the above-referenced provisions are reasonable, and that she voluntarily entered into the agreement after having had an opportunity to review it with her counsel:

> i. *You acknowledge that you have carefully considered the nature and extent of the restrictions upon you and the rights and remedies conferred upon JPMC under Sections 7, 8, and 9 of this Agreement, and have had the opportunity to retain legal counsel at your own expense to review this Agreement. You acknowledge that these restrictions are reasonable in time and geographic scope, are fully required to protect the legitimate interests of JPMC and its customers and do not confer a benefit upon JPMC which is disproportionate to any detriment to you.*
>
> ii. *You acknowledge that the terms and conditions of Sections 7, 8 and 9 of this Agreement incorporate and/or supplement the terms and conditions of your employment at JPMC and are reasonable and necessary to protect the valued business interests of JPMC and that you have received good and valuable consideration for entering into this Agreement.*
>
> iii. *You acknowledge that you were made aware of this Agreement at the time you accepted employment with JPMC or at the time you were afforded the opportunity of receiving sales-related compensation for the sale of non-deposit investment products, and*

12

*that you are signing it knowingly and voluntarily and are accepting or continuing employment with full understanding of its terms and conditions. You further acknowledge the reasonableness and enforceability of the terms of this Agreement, and you will not challenge the enforceability or terms of this Agreement.*

34.     In addition, in Section 10(b) of the 2014 Non-Solicitation Agreement, Defendant acknowledges that any breach of the provisions set forth above will cause irreparable harm to JPMorgan entitling it to seek immediate injunctive relief and to recover its attorneys' fees in connection with instituting any legal proceeding and/or arbitration to enforce the agreement.

35.     The 2007 Non-Solicitation Agreement contains substantially similar provisions to those in the 2014 Non-Solicitation Agreement.

36.     In consideration for entering into and continuing her employment relationship with JPMorgan and executing her non-solicitation agreements with JPMorgan, Defendant was provided with significant benefits, including substantial compensation, office and support facilities, securities registration, research, and health insurance.

## JPMorgan's Relationship with Its Clients and Its Confidential Information

37.     As indicated above, virtually all of the clients assigned to Defendant were pre-existing JPMorgan clients who were reassigned to Defendant, were long-term Chase Bank clients who were referred to Defendant, or were developed by JPMorgan at the time they were assigned to Defendant.

38.    JPMorgan has invested substantial time and money, totaling millions of dollars, to acquire, develop and maintain its clients over many years.  It is with great difficulty, and only after a great expenditure of time, money and effort, that JPMorgan was able to acquire its existing clients.  JPMorgan spends substantial resources in gaining knowledge about its clients and protecting the privacy of such information.  It typically takes many years of dealing with clients for JPMorgan to become their primary investing firm.  JPMorgan clients typically remain with and continue to be serviced by the firm, regardless of whether the Advisor or other team members resign or leave JPMorgan.  But for Defendant's employment with JPMorgan, Defendant would not have had any contact with virtually any of the clients the firm assigned to her and whom she is now soliciting.

39.    During the course of her employment by JPMorgan, Defendant had access to highly confidential JPMorgan client files in addition to other financial information that is confidential and proprietary to JPMorgan.  JPMorgan's client files contain confidential financial information regarding each client, including client identity, address, telephone numbers, transactional history, tax information, personal financial data, banking information and investment objectives, among other confidential and proprietary data.  Defendant had no interaction with virtually any of the clients she was assigned at JPMorgan (and no knowledge of any of their confidential information) until she started working at JPMorgan.  As

14

indicated above, this information has been collected at great expense to the firm, is not easily duplicated, and would be extremely valuable to a competitor.

40.    A critical factor to JPMorgan's continued success is its relations with its clients.  JPMorgan has built the loyalty of its client base through many years of effort and has invested substantially in building JPMorgan's goodwill.  JPMorgan spends substantial resources in terms of time, effort and money annually to provide programs and support to its Chase Wealth Management employees, including Defendant, for them to use to obtain and build relationships with its clients.

41.    JPMorgan's records maintained concerning its clients are not available from other sources and have been created and updated for a period of many years based on JPMorgan's relationship with its clients.   JPMorgan has invested substantial corporate resources to develop and maintain its client information. Virtually all of the JPMorgan clients that Defendant serviced were developed by JPMorgan at great expense and over a number of years.  JPMorgan's client list is the lifeblood of its business and the expenditures incurred by JPMorgan in obtaining its clients include the millions of dollars spent by JPMorgan every year on national and local advertising and marketing, the millions of dollars it costs to train JPMorgan's employees, and the many other expenditures JPMorgan incurs in maintaining its goodwill in the industry.

42.     JPMorgan also has expended significant resources to service its clients. These resources include millions of dollars a year JPMorgan spends for support staff, clearing services, operations personnel, systems and support, management and compliance supervision, salaries, annual registration fees, computer services and equipment, phone, mail, research, literature, seminars, trade and other professional news publications, promotional events, securities research and analysis, and other services. JPMorgan has borne the entire expense of these services and activities as well, with no financial contribution from Defendant.

43.     JPMorgan employs reasonable efforts to maintain the confidentiality of its client records. Specifically, access to the records is restricted to those employees whose jobs require them to refer to this information, duplication of the records is prohibited and there are constant reminders about the confidential nature of the information contained on the records.

44.     The confidential information that Defendant, on information and belief, has taken or retained was entrusted to JPMorgan by its clients with the expectation that it would remain confidential and would not be disclosed to third parties. Indeed, by law JPMorgan must safeguard this information until such time as the controlling authorities authorize its release. Defendant had access to this information solely by virtue of her employment by JPMorgan. JPMorgan and Defendant are obliged to maintain the confidentiality of this information. For its

part, JPMorgan took numerous steps to protect the confidentiality of this information. Defendant was fully aware of, and responsible for, complying with JPMorgan's internal policies regarding confidentiality. JPMorgan has implemented numerous other policies, and has established tight security, to ensure the confidentiality of its client information. For example, access to JPMorgan's computer network by its professionals is password-protected. JPMorgan also limits its client information to certain employees and management who need access to such information.

45.    Employees such as Defendant must maintain client information as strictly confidential. These instructions are confirmed in the various agreements and provisions referenced.

## **Defendant's Misconduct**

46.     As noted above, VanSpybrook's employment with JPMorgan ended on October 17, 2024.  She joined Morgan Stanley later that same day, and began soliciting JPMorgan clients shortly thereafter.

47.     As set forth above, at least twelve JPMorgan clients have informed JPMorgan that shortly after VanSpybrook resigned, she called them, often on clients' personal cell phone numbers, and solicited their business, requested meetings with the clients or otherwise attempted to get them to transfer their accounts to her at her new firm.

48.     Defendant's solicitation of JPMorgan clients is ongoing and continuing.

49.     On information and belief, without misappropriating JPMorgan's confidential client information, VanSpybrook would not have had clients' personal phone numbers, and would not have had the ability to call JPMorgan clients after she joined her new firm.

50.     Defendant's misconduct is highly disruptive to JPMorgan's ability to conduct business in a stable manner and to maintain JPMorgan's goodwill with its clients.  Unless Defendant's misconduct is immediately restrained and enjoined, other competitors of JPMorgan will be encouraged to engage in the same kind of improper behavior with complete impunity, the result of which will inflict severe and permanent damages on JPMorgan.

51.     Defendant's misconduct, as described above, constitutes at a minimum, breach of Defendant's contract, breach of Defendant's fiduciary duties and duties of loyalty, tortious interference, and conversion.  Unless Defendant's conduct is immediately enjoined, JPMorgan's other employees will be encouraged to engage in the same improper conduct.  This misconduct is highly disruptive to JPMorgan's ability to conduct business in a stable manner and to maintain JPMorgan's goodwill with its clients and employees.

52.     By improperly soliciting JPMorgan's clients, Defendant has caused and will continue to cause continuing and irreparable injury to JPMorgan which cannot be cured by monetary damages.  Defendant's wrongdoing has caused and will continue to inflict irreparable harm to JPMorgan by causing:

    (a)    Loss of JPMorgan clients and loss of client confidence;

    (b)    Injury to JPMorgan's reputation and goodwill in Michigan;

    (c)    Use and disclosure of JPMorgan's confidential and proprietary information, including client lists;

    (d)    Damage to office morale and stability, and the undermining of office protocols and procedures; and

    (e)    Present economic loss, which is unascertainable at this time, and future economic loss, which is now incalculable.

## FIRST CAUSE OF ACTION
**(Breach of Contract)**

53.     JPMorgan realleges and incorporates herein by reference the allegations of paragraphs 1 through 53 hereof.

54.     Defendant breached her contracts and agreements with JPMorgan by soliciting JPMorgan's clients and by, on information and belief, taking JPMorgan's confidential client information.  By soliciting JPMorgan's clients and using and disclosing JPMorgan's proprietary and confidential information, Defendant seeks to convert to her benefit JPMorgan's protectable interests.

55.     JPMorgan has performed all of its duties under all such contracts.

56.     JPMorgan has been injured and will continue to be injured by Defendant's breaches of her agreements with JPMorgan in an amount which cannot readily be ascertained or compensated by money damages.

57.     As a direct and proximate result of Defendant's breach of her contracts, JPMorgan has sustained and will continue to sustain irreparable injury, the damages from which cannot now be calculated.  Accordingly, JPMorgan is entitled to a temporary restraining order and a preliminary injunction.

## SECOND CAUSE OF ACTION
### (Conversion)

58.    JPMorgan realleges and incorporates herein by reference the allegations of paragraphs 1 through 58 hereof.

59.    At all times, JPMorgan was, and still is, entitled to the immediate and exclusive possession of its confidential and proprietary information, and all physical embodiments thereof, as alleged above.

60.    JPMorgan is informed and believes that Defendant took JPMorgan's confidential and proprietary information, including, but not limited to confidential client contact information, and converted such information for the use of Defendant and those acting in concert with her.

61.    The continued detention of JPMorgan's personal property by Defendant constitutes conversion.

62.    As a direct and proximate result of Defendant's conversion, JPMorgan has sustained and will continue to sustain irreparable injury, the damages from which cannot now be calculated.  Accordingly, JPMorgan is entitled to a temporary restraining order and a preliminary injunction.

## THIRD CAUSE OF ACTION
### (Breach of Fiduciary Duty and Duty of Loyalty)

63.    JPMorgan realleges and incorporates herein by reference the allegations contained in paragraphs 1 through 63 hereof.

64.    As an employee, Defendant owed JPMorgan a fiduciary duty of trust and an undivided duty of loyalty.

65.    Defendant's duty of loyalty and fiduciary duties required her at all times to, among other things, act in JPMorgan's best interests and maintain the confidentiality of JPMorgan's confidential and proprietary business and customer information.  Defendant's duty of loyalty and fiduciary duties required her at all times to refrain from, among other things, soliciting JPMorgan's clients to join her at a competing company.

66.    Defendant breached her duty of loyalty and fiduciary duty to JPMorgan by engaging in the conduct alleged above.  Defendant engaged in such wrongdoing upon her resignation from JPMorgan and joining JPMorgan's competitor, Morgan Stanley.

67.    As a direct and proximate result of Defendant's breach of her fiduciary duties and her duty of loyalty, JPMorgan has sustained and will continue to sustain irreparable injury, the damages from which cannot now be calculated. Accordingly, JPMorgan is entitled to a temporary restraining order and a preliminary injunction.

## FOURTH CAUSE OF ACTION
### (Intentional and/or Negligent Interference with Actual and Prospective Economic Advantages)

68.     JPMorgan realleges and incorporates herein by reference the allegations of paragraphs 1 through 68 hereof.

69.     JPMorgan has developed and maintains advantageous actual and prospective business relationships with its clients that promise a continuing probability of future economic benefit to JPMorgan.

70.     JPMorgan is informed and believes, and on that basis alleges, that Defendant knew or reasonably should have known about JPMorgan's advantageous actual and prospective business relationships with its clients.

71.     JPMorgan is informed and believes, and on that basis alleges, that Defendant has intentionally or negligently interfered with, and continues to interfere with, JPMorgan's relationships with its clients by, among other things, directly and/or indirectly attempting to induce JPMorgan clients to sever their relationships with JPMorgan and to induce them to do business with her new firm.

72.     There was no privilege or justification for Defendant's conduct. Moreover, Defendant's actions also constitute wrongful conduct above and beyond the act of interference itself, including breach of contract, unfair competition, and breach of her fiduciary duties.

73.     Defendant's conduct was and continues to be improper, willful and malicious.

74.     As a direct and proximate result of Defendant's tortious interference with actual and prospective business relationships, JPMorgan has sustained and will continue to sustain irreparable injury, the damages from which cannot now be calculated.  Accordingly, JPMorgan is entitled to a temporary restraining order and a preliminary injunction.

## FIFTH CAUSE OF ACTION
### (Unfair Competition)

75.     JPMorgan realleges and incorporates herein by reference the allegations of paragraphs 1 through 75 hereof.

76.     Defendant's conduct as set forth above and incorporated herein is unlawful, unfair, fraudulent and deceptive, and constitutes unfair competition.

77.     As a direct and proximate result of the Defendant's' unfair competition, JPMorgan has sustained and will continue to sustain irreparable injury, the damages from which cannot now be calculated.  Accordingly, JPMorgan is entitled to a temporary restraining order and a preliminary injunction.

WHEREFORE, JPMorgan respectfully requests that a judgment be entered in its favor against Defendant as follows:

A.     In support of all claims for relief, a temporary and preliminary injunction lasting until such time as a duly appointed panel of arbitrators at FINRA

renders an award in the underlying dispute, enjoining and restraining Defendant,

directly or indirectly, and whether alone or in concert with others, including but not

limited to the directors, officers, employees, representatives and/or agents of

Morgan Stanley, from:

> (i) soliciting, attempting to solicit, inducing to leave or attempting to induce to leave any JPMorgan client serviced by Defendant at JPMorgan or whose names became known to Defendant by virtue of her employment with JPMorgan (or any of its predecessors in interest), excluding only those clients Defendant formally serviced as broker of record at her prior firm and immediate family members; and
>
> (ii) using, disclosing or transmitting for any purpose JPMorgan's documents, materials and/or confidential and proprietary information pertaining to JPMorgan, JPMorgan's employees, and/or JPMorgan's clients.

B.    Ordering Defendant, and all those acting in concert with her, to return

to JPMorgan or its counsel all records, documents and/or information in whatever

form (whether original, copied, computerized, electronically stored or handwritten)

pertaining to JPMorgan's customers, employees and business, within 24 hours of

notice to Defendant or her counsel of the terms of such an order.

C.    Such other and further relief as the Court deems just and proper.

Dated:  November 7, 2024

Respectfully submitted,


*/s/ Isa M. Kasoga*
Isa M. Kasoga (P70448)
*Attorney for Plaintiff*
J.P. Morgan Securities LLC
220 West Congress St, Suite 500
Detroit, MI 48226
(313)961-2550/ (313)961-1270 (Fax)
ikasoga@lewismunday.com

## CERTIFICATE OF SERVICE

I certify that on November 7, 2024, I electronically filed the foregoing Complaint with the Clerk of the Court using the CM/ECF system.  I certify that I have also caused to be mailed by electronic mail and United States Postal Service the foregoing document to the following:

> Nathaniel R. Wolf
> Mika Meyers PLC
> 900 Monroe Avenue, NW
> Grand Rapids, MI 49503
> nwolf@mikameyers.com

*/s/Raylin Talbert*
Raylin Talbert
